MONCURE, J.
The maxim sic utere tuo ut alienum non líedas emphatically applies to the case of a riparian proprietor, and is the true legal as well as moral measure of his rights. He has no right to divert the stream, or anjr part of it, from its accustomed course, to the injury of other persons. This is a plain proposition, laid down by all the writers on the subject of water rights, and was not denied by the counsel for the appellee.
But he contended that it is confined in its application to the ordinary course of the stream, and that a riparian proprietor may lawfully protect his property from floods, by erecting a dike or other obstruction on his own land, though its necessary effect may be to turn the superabundant water on the land of his neighbor. Such a distinction between the ordinal and extraordinary flow of a stream, is not laid down or recognized by any elementary writer, nor in any adjudged case, so far as I have seen. The utmost extent to which the authorities seem to go in that direction,is, that a riparian proprietor may erect any work in order to prevent his land being overflowed by any change of the natural state of the stream, and to prevent its old course from being altered. Angelí on *Water Courses, 1 333. But he has no right, for his greater convenience and benefit, to build any thing which, in times of ordinary flood, will throw the water on the grounds of another proprietor, so as to overflow and injure them. Id. ? 334. If, in the case of such an obstruction, it appears that the injury therefrom arose from causes which might have been foreseen, such as ordinary periodical freshets, he is liable for the damage. Id. § 349. That the supposed distinction does not exist was expressly decided by the Court of king’s bench in Rex v. Trafford, 20 Eng. C. B. R. 498. Tenterden, C. J., in delivering the judgment of the court in that case said, “Now it has long been established that the ordinary course of water cannot be lawfully changed or obstructed for the benefit of one class of persons, to the injury of another. Unless, therefore, a sound distinction can be made between the ordinary course of water flowing in a bounded channel at all usual seasons, and the extraordinary course which its superabundant quantity has been accustomed to take at particular seasons, the • creation and continuance of these fenders cannot be justified. No case was cited, or has been found, that will support such a distinction.” Id. 502. The judgment in that case was reversed in the Exchequer chamber. Trafford v. Rex, 21 Eng. C. L. R. 272. But that court agreed in the principle laid down by the court of king’s , bench, though it did not discover, upon the special verdict, a finding of sufficient facts to warrarit its application to the case.
It is often the mutual interest of adjacent riparian proprietors to agree to erect works on their respective lands to protect them against floods, and keep the water at all times in its natural channel. That interest is generally sufficient to bring them to such an agreement. But in the absence of agreement express or implied, or of any statutory provision on the subject, *the law affords no means of compelling the erection of such works, however beneficial they might be to the proprietors or the public, and will not allow one proprietor, by erecting such works on his land, to compel another to erect similar works on his as a necessar3T means of defense. Each has the exclusive right to judge and act for himself on this subject; taking care not to injure the property of the'other.
But the counsel of the appellee further contended that as Burwell has a dike on his land, which'has the effect of throwing the water, in freshets, on the land of Witlis W. Hobson, the latter has therefore a right to erect a dike on his land to defend it against such inundation.
The correctness of this position depends upon whether the dike of Burwell was lawfully erected, and whether he has a legal right to the protection which it affords him.
It was certainly lawfully erected. It was erected many years ago by Joseph Hobson, under whom both of the parties claim, and who was then the proprietor of the lands of both. He had a perfect right to erect it, as it interfered with nobody but himself. Before he erected it, the water of the creek, in freshets, diffused itself over the land on both sides. He wished entirely to protect his valuable arable land on the south side from inundation, by causing all the super *602 abundant watér to flow on the north side, the upper part of which was then, as now, in woods, and naturally more capable of resisting' high water than open land, as well as less liable to injury from being overflowed. He erected the dike for that purpose; and it had the desired effect. In this state of the property he died intestate, and it was divided by decree of a court of chancery among his heirs; the land on the south side, containing one hundred and twenty acres, being allotted to his son Joseph V. Hobson, and that on the *"north, containing one hundred and sixty acres, being allotted to the ap-pellee Willis W. Hobson. The land on the south side was conveyed by Joseph V. Hob-son to Thomas R. Hobson in 1834, and by the latter to the appellant Burwell in 1838. The dike has been repaired by the successive proprietors of the land, from time to time since the death of the intestate Joseph Hobson, and is' now in the same state in which it then was, except that there are a few breaches in it which need repair.
Then has not the appellant a legal right to the dike, and to the protection whi.ch it affords him?' Why is he not as much so entitled as he is to any other part of the land on which it stands? What difference is there between an artificial dike lawfully erected, as this was, and a natural mound? There is a natural mound below the dike; which is but an artificial continuation of that mound to a point near the upiper line. Until the dike was erected, the proper course of a part only of the superabundant water produced by freshets, was over the northern side; after that erection, the proper course of all that water was over that side; just as if, from natural causes, it had always flowed on that side. The change was made by one who had a perfect right to make it. And the flow of the- water can no more be disturbed, to the injury of another, in its new' direction, than it could have been in its natural course. Suppose the intestate had changed the ordinary bed of the creek, and made it run entirely through the land on the north side of the natural bed. Could the appellee, by any obstruction of the new bed, turn back the stream to the old, to the injury of the appellant? What difference is there between a change of the course of the ordinary stream and a change of the course of the superabundant water produced by freshets? Suppose a mill had been erected, instead of a dike, on the south side; and the *water thrown back on the land on the north side; would not the appellant have been entitled to the mill and its appurtenances, including the right to overflow the land on the north side? That he would be, is shown by the case of Kilgour v. Ashcom, S Har. & John. 82, in which a similar question arose. The children of the intestate, said the court in that case, “took their respective proportions of their father’s estate in the same condition, and subject to the same advantages and disadvantages under which he held it.’’
It is admitted that the commissioners who divided the intestate’s land might have given to the lot on the south side the advantages of the dike thereon, and subjected the lot on the other side to the disadvantage of it; but it is said that it should plainly appear on the face of the report, that they intended to do so; otherwise it will be presumed that they did not; and that in this case no such intention appears in the report, nor does it appear therein, or from any extrinsic evidence, that they considered the advantages and disadvantages of the dike in making the division. The dike is not mentioned in the report; and the only evidence it affords that the dike was considered by the commissioners in making the division, is the disparity in the quantity of the two lots. On the other hand the evidence shows that the average value of the land on the south was greater than that on the north side of the creek, but does not show that the value of the land on the south side without the dike, would be equal to that on the north.
But I think that while the commissioners might have directed the dike to be taken down, or allowed the appellee to erect a similar dike on his side of the creek, the presumption, in the absence of evidence on the' face of the report to the contrary, is, that they did not intend to do so, but intended to give the dike and all its advantages to the heir on whose lot it stood. *They saw the dike, and knew its advantages and disadvantages. How can it be fairly presumed that they did not consider them in making the division? ‘ ‘It was. the duty of the commissioners (said the court in Kilgour v. Ashcom, before cited), and it must be supposed that they did, in dividing the estate of John Keech, to take into consideration all the advantages and disadvantages attending the respective parts, and that they gave to the part allotted to Mary .Keech an equivalent for the injury and. inconvenience occasioned by the mill dam; and she took it accordingly.” These observations are just, and strongly apply to this case.
If the intestate had conveyed the land, with the dike thereon, to the appellant, the latter would have been entitled to the benefit of the dike, and the intestate could not have deprived him thereof, by erecting a dike on the other side. If the heirs had divided the land among themselves by mutual agreement, and interchanged deeds for the lot of each, the deed conveying the lot with the dike thereon would have entitled the grantee to the benefit of the dike, and he could not have been deprived thereof by the act of any of the other heirs. There is no difference in this respect between a partition by suit, and a partition by mutual agreement and the interchange of deeds. In each case the heirs are in effect purchasers of their respective lots, and entitled to hold them as any other purchaser would be.
The appellee in his answer seems to admit that the appellant is entitled to the benefit *603 of the dike on his land, but claims a right to erect a similar dike on his own land for the purpose of defending it from inundation occasioned by the dike of the appellant. This admission, I think, concedes the whole question in controversy. Tor if the appellant be entitled to the benefit of the dike, I do not see how it can be taken away from him indirectly, by erecting a counter dike *on the other side. But even if the appellee were entitled to this mere right of defense, it would not justify him in erecting a dike much higher and stronger than that of the appellant. Having erected such a dike, he was compelled to rely on other grounds for his justification, and therefore claimed a right to erect any obstruction on his own land which may be necessary to protect it from floods, though the superabundant water be thereby thrown on the land of his neighbor. This ground is wholly irrespective of the question as to the right of the appellant to the benefit of the dike on his land, and would, if sustainable, be a sufficient justification even if no such dike existed. But I think I have said enough to show that the right so claimed by the appellee does not exist. As to the other ground relied on by him that his dike is necessary to prevent the creek from changing its original bed, I concur in the opinion of the Circuit court that it is not necessary, and was not erected for that purpose.
In any view of the case, it seems to me that the decrees of the Circuit court are erroneous. They not only take away from the appellant the benefit of a dike lawfully erected upon his land, but place him on worse ground than he would have occupied if no such dike had ever existed. They require him to take it down, and leave his land exposed to be overflowed, not only as it was before any dike was erected thereon, but by the whole quantity of water which may at any time overflow the natural bed of the creek, if the appellee should avail himself of the liberty given him of erecting a dike six feet high on his side of the creek, and the appellant should not avail himself of a similar liberty given to him. It would of course be competent for the parties, by their own agreement, to make such an adjustment of their rights as this; but I do not see on what principle it can be decreed without their consent.
*Upon the whole, I think that the appellant is entitled to the benefit of the dike on his land, as it stood at the time of the division of the estate of Joseph Hob-son among his heirs, and to repair and keep it up; and that the appellee has no right to erect any dike or other obstruction on his land, which will have the effect of injuring the land of the appellant, or the dike thereon.
The evidence clearly shows that the dike which the appellee was constructing, when he was enjoined from so doing in this case, would have the effect of washing away the appellant’s dike, overflowing his valuable low grounds, and turning the course of the creek permanently through them; and of thus doing him irreparable injury. This is a wrong which a court of chancery has power to prevent and redress.
I am therefore of opinion that the decrees of the Circuit court are erroneous, and ought to be reversed with costs, and that the injunction ought to be perpetuated with costs, and with liberty to the appellant to apply to the Circuit court to cause an abatement to be made of the dike already constructed on the land of the appellee, or so much thereof as may have the effect of injuring the land of the appellant or the dike thereon.
The other judges concurred in the opinion of Moncure, J.
The decree was in conformity to the opinion.